UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TONDA LIGGETT,

Plaintiff,

v.

WASHINGTON STATE UNIVERSITY, ELSON FLOYD; WARWICK BAYLY; KAREN SCHMALING; A.G. RUD; GISELA ERNST-SLAVIT; DAVID SLAVIT; and BRUCE ROMANISH,

Defendant.

CASE NO. C13-5176 RJB

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the court on Defendants' Motion for Summary Judgment (Dkt. 32). The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

**RELEVANT FACTS**

In 2006, Washington State University (WSU) hired plaintiff as a tenure-track Assistant Professor of Education at the Vancouver campus. Dkt. 37-1; Dkt. 39 at 1. The parties agree that plaintiff's progress towards tenure was evaluated annually, with intensive review in her third and

sixth years of employment. Dkt. 37-1; Dkt. 41-7; Dkt. 41-9. Plaintiff contends that defendants Slavit, Ernst-Slavit, Romanish, Rud, and Schmaling were aware of plaintiff's sexual orientation as a lesbian at all material times. Dkt. 41-1 at 3; Dkt. 41-2 at 4; Dkt. 41-3 at 14; Dkt. 41-4 at 3, 5.

Standards for WSU Tenure-Track Professors

Criteria for tenure-track assistant professors at WSU includes teaching and advising college and graduate students, continuing research, publishing in high quality peer-reviewed journals and other relevant publications, and presenting at national and international peer-reviewed professional conferences. Dkt. 37-3; Dkt. 41-11. Progress Toward Tenure Reviews (PTTRs) are given to tenure-track professors in the first, second, fourth, and fifth years. Dkt. 37 at 3; Dkt 41-7. WSU reviews the professor's full portfolio in the third and sixth years; such reviews involve recommendations from several individuals. Dkt. 37 at 3; Dkt. 41-8, 47-13.

According to the Tenure and Promotion Handbook provided by both parties, the final portfolio review in the sixth year includes letters from at least five external evaluators who are peers from other universities in the candidate's field. Dkt. 37-3; Dkt. 41-11. After reviewing such letters, tenured faculty in the candidate's department review the sixth-year tenure portfolios and make recommendations (or "votes," using the handbook's language) with supporting rationale why a candidate should or should not be tenured. Dkt. 37-3; Dkt. 41-11. The department chair then submits his or her own recommendation and summarizes the faculty recommendations to the College of Education Faculty Affairs Committee (CEFAC). Dkt. 37-3; Dkt. 41-11. The CEFAC then provides a recommendation and forwards the information to the College Dean. Dkt. 37-3; Dkt. 41-11. The College Dean and the campus Vice Chancellor then concurrently make their recommendations to the Provost, who makes the final decision based on

all the previous recommendations and comments.  Dkt. 37-3; Dkt. 41-11.

Plaintiff's Tenure Review Process

 Plaintiff's cumulative progress toward tenure and promotion was reviewed annually by the Department Chair for the College of Education, the Dean of the College, the Vice Chancellor of Academic Affairs, the Director of Education for the Vancouver campus, and the faculty of the College.  Dkt. 37-7–37-10; Dkt. 41-11.  The reviews monitored progress in three areas: research and publications, teaching, and service to the college and professional community.  Dkt. 37-3; Dkt. 41-11.  Plaintiff contends that, between her reviews, she received guidance and counseling from her mentor committee of tenured faculty, which included defendant Dr. Gisela Ernst-Slavit.  Dkt. 42 at 2, Dkt. 41-17.  In 2007 and 2008, plaintiff received the highest rating of "satisfactory" on her PTTRs.  Dkt. 37-7–37-8, Dkt. 41-7 at 1–4.

*Third-Year Annual Review*

 Plaintiff's 2009 PTTRs were rated between "satisfactory" and "needs improvement," with one "unsatisfactory" rating; approximately half of the tenured faculty rated plaintiff as "satisfactory."  Dkt. 37-10; Dkt. 41-13.  The unsatisfactory rating concerned whether to count plaintiff's under-review work as completed publications.  Dkt. 37-10, 37-11; Dkt. 41-13 at 22–23.  In the comments of such reviews, tenured faculty seemed to agree that plaintiff met expectations in the areas of teaching and service, but some comments advised plaintiff to focus on publishing more research, particularly to publishing in well-regarded publications.  Dkt. 37-10; Dkt. 41-13.

*Fourth and Fifth Year Annual Reviews*

 Plaintiff received a "satisfactory" rating for her 2010 PTTR, and again some faculty members suggested that plaintiff "should focus on top-tier journals in her field as outlets for her

scholarship." Dkt. 37-12; Dkt. 41-7 at 5–6. In April 2011, Plaintiff received a "satisfactory" rating on her tenure review. Dkt. 37-13; Dkt. 41-7 at 7–8. The review recommended that plaintiff continue to work on her teaching, target top-tier journals for publication venues, and identify avenues for contributing both within her program and within the larger campus. *Id.*

*Final Year Annual Review*

When the Tenure and Promotion Review Committee met in late 2011 to discuss tenure candidates' qualifications and materials, the majority of the faculty, the Department Chair, and all eight external reviewers supported plaintiff's candidacy for tenure. Dkt. 37-17, 37-14; Dkt. 41-18. Both the Director of Education for the Vancouver campus and the College of Education Chairwoman voted in favor of tenure. *Id.* The overall committee vote was 17 to 3 in favor of tenure. Dkt. 37-14; Dkt. 41-18. The three individuals who recommended denial of plaintiff's tenure were defendants Ernst-Slavit, Slavit, and Romanish. *Id.* While defendants Ernst-Slavit and Slavit expressed misgivings about the areas of teaching, service, and scholarship, defendant Romanish focused on the area of scholarship as lacking but also mentioned an account about a possible teaching deficiency. *Id.* Their primary comments were that plaintiff had not published in top-tier journals and that her publications appeared to be reiterations of her dissertation, rather than new research contributing to the field. *Id.*

The CEFAC was unable to reach a recommendation upon review of plaintiff's portfolio, although CEFAC made a recommendation in every other case it was presented that year. Dkt. 37-16; Dkt. 41-12. CEFAC expressed concerns about plaintiff's research productivity, and noted the positive reviews of the external recommenders. *Id.*

On October 31, 2011, defendants Rud and Schmaling recommended that plaintiff's application for tenure be denied. Dkt. 37-17; Dkt. 41-8 at 4–8. Both Rud and Schmaling found

her qualifications in teaching and service above expectations, but found her scholarship to be underdeveloped. *Id.* Defendant Rud noted that the lack of new research along with a low quantity of publications was the detrimental combination that led him to recommend denial. *Id.* Defendant Schmaling commented that, of plaintiff's seven publications, three were interviews, and approximately four overlapped in substance and topic with one another, in addition to overlap with her dissertation. *Id.* Both defendants Rud and Schmaling noted that the tenure guidelines provide that "the greatest emphasis" in tenure applications is on "consistent, sustained, and significant" scholarship. *Id.*

Defendant Dr. Bayly decided to deny plaintiff's tenure based on the submitted tenure materials because (1) plaintiff did not sufficiently address the concerns raised in her third year review regarding more publications in general and in top-tier journals, and (2) the negative recommendations in combination with several lukewarm positive recommendations. Dkt. 37. Defendant contends that Dr. Bayly was unaware that plaintiff identified as lesbian at the time he made her tenure decision. Dkt. 37. It is uncontested that, on March 1, 2012, defendant Dr. Bayly notified plaintiff of the denial of tenure and promotion, and of the termination of her faculty appointment and the end of the 2012-2013 academic year. Dkt. 1 at 10; Dkt. 37-19.

Appeal to the President of WSU

On March 30, 2012, plaintiff appealed her denial of tenure to defendant Floyd, President of WSU. Dkt. 33-2; Dkt. 41-22. On June 7, 2012, Defendant Floyd denied the appeal, which was purely based on procedural errors, after considering the recommendation of the Faculty Status Committee to deny. *Id.*

## PROCEDURAL HISTORY

On March 3, 2013, plaintiff filed this suit against defendants, alleging violations of Equal

Protection (42 U.S.C. § 1983), Gender Discrimination under Title VII (42 U.S.C. § 2000e, *et seq.*), and Washington Law Against Discrimination (WLAD) (RCW 49.60.010, RCW 49.60.030). Dkt. 1 at 10–14. Plaintiff alleges that the University, as well as several of its employees, discriminated against her based on her sexual orientation. *Id.*

On January 30, 2014, defendants filed this Motion for Summary Judgment, arguing that plaintiff's claims fail to state a claim under Title VII, § 1983, and WLAD. Dkt. 32. Under Title VII, defendants argue that (1) plaintiff failed to pursue administrative relief with the Washington State Human Rights Commission before filing suit, (2) Title VII does not protect against sexual orientation discrimination, and (3) the individual defendants cannot be sued under Title VII. *Id.* at 12–13. Under § 1983, defendants argue that: (1) defendants are not "persons" who can be sued for damages under § 1983; (2) defendants are protected by Eleventh Amendment immunity; and (3) there is insufficient evidence of the individual defendants' personal participation causing constitutional harm because only defendant Bayly had the power to deny her tenure and his decision was based on a non-discriminatory reason. *Id.* 13–20. Under WLAD, defendant concedes that plaintiff is a member of a protected class (sexual orientation), but again alleges a lack of evidence that her denial of tenure was insufficiently justified or based on her sexual orientation. *Id.* 20–21.

On February 17, 2014, plaintiff responded, conceding that its Title VII claim will not survive this motion for summary judgment, but contending that she has presented sufficient evidence for her § 1983 and WLAD claims. Dkt. 38. In regards to her § 1983 claim, plaintiff contends that (1) she can sue WSU for injunctive relief and individual defendants for any relief, (2) there is no Eleventh Amendment immunity for individuals sued in their individual capacity, (3) individuals who voted to deny her tenure (Ernst-Slavit, Slavit, Romanish) sufficiently

participated because the Provost lacked sufficient specialization in plaintiff's field to evaluate her scholarship, and defendants Schmaling, Rud, Bayly, and Floyd failed to remedy a known discriminatory environment. Dkt. 38 at 18–20. Plaintiff also added that WSU was aware of a discriminatory environment towards homosexuals because of verbal complaints made to Rud and Schmaling regarding at least two other similarly situated heterosexual professors were awarded tenure and at least two other homosexual professors were denied tenure. *Id.* Under the WLAD claim, plaintiff re-alleges that the same argument from her § 1983 claim regarding similarly situated individuals. Dkt. 38 at 11, 16–17.

On February 21, 2014, defendant replied that plaintiff has not sufficiently pled that she was similarly situated to the cited heterosexual comparators, nor that the individual defendants personally participated in causing her constitutional harm. Dkt. 39. As to the similarly situated argument, defendants claim that (1) plaintiff's allegations that Drs. Day, Nelson, Oforlea, and Narayanan are heterosexual is not sufficient evidence to prove sexual orientation; (2) plaintiff's opinion regarding those four individuals' tenure portfolios is irrelevant; (3) the record does not reflect that it was Dr. Bayly who denied Drs. Day and Nelson's tenure, or whether defendants Rud and Schmaling were involved; and (4) plaintiff provides no evidence regarding the basis for Drs. Oforlea and Narayanan's successful appeals. *Id.* Defendant seems to concede that, to the extent plaintiff's claims against the state are for injunctive relief only, plaintiff's claims are allowable under § 1983's official capacity requirement. *Id.*

## <u>DISCUSSION</u>

### I. EVIDENTIARY OBJECTIONS

In its response, plaintiff requests that the court strike four evidentiary submissions from defendant Bayly's declaration. Dkt. 38 at 1–2. Defendants also made evidentiary objections,

asking the court to strike Plaintiff's declaration to the extent that it contradicts her deposition testimony. Dkt. 43 at 2.

Plaintiff's Motion to Strike and defendants' Motion to Strike are denied. The court has noted these objections, as well as the relevance of these items, and the court has accorded them the proper nominal weight.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec.*

*Serv. Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

The Ninth Circuit has provided additional guidance when an employer brings a motion for summary judgment in an employment discrimination case. Such motions must be carefully examined in order to zealously guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). This high standard means that an employee need only produce "very little evidence" to survive summary judgment in a discrimination case because the ultimate question is one that can only be resolved through a "searching inquiry"—one that is most appropriately conducted by the fact-finder, upon a full record. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotations omitted).

## III. ELEVENTH AMENDMENT IMMUNITY AND § 1983 OFFICIAL CAPACITY

"As the Supreme Court has applied the Eleventh Amendment, an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Pittman v. Or. Emp't Dept.*, 509 F.3d 1065, 1071 (9th Cir. 2007) (internal quotations omitted). There are exceptions to Eleventh Amendment immunity. *Id.* For example, sovereign immunity does not bar suits for prospective injunctive relief against individual state officials

acting in their official capacity. *Id*. The "Eleventh Amendment does not bar damage suits against state officials in their *personal* capacity." *Hydrick v. Hunter*, 500 F.3d 978 (9th Cir. 2007) (internal citations omitted) (emphasis in original).

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

A defendant cannot be held liable under 42 U.S.C. § 1983 solely based on supervisory responsibility or position. *Monell v. N.Y. City Dep't of Social Srvs.*, 436 U.S. 658, 694 n.58 (1978). In *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), the U.S. Supreme Court held that "a State is not a person within the meaning of § 1983," and that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office [and thus is] no different from a suit against the State itself."

Under *Will*, a state official in his or her official capacity, when sued for injunctive relief, as distinguished from a suit for damages, would be a person under 42 U.S.C. § 1983, because official-capacity actions for prospective relief are not treated as actions against the State. *Id.* at 71 n.10. Further, the *Ex Parte Young* exception to Eleventh Amendment immunity allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute. *See Ex Parte Young*, 209 U.S. 128, 159 (1908) (enjoining enforcement of a State statute

found to violate the U.S. Constitution); *Green v. Mansour*, 474 U.S. 64, 68 (1985) (applying *Ex Parte Young* to an action involving State violation of a federal statute). This exception to sovereign immunity is based on the idea that a State officer who acts in violation of the Constitution is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Ex Parte Young*, 209 U.S. at 160.

In this case, plaintiffs contends that she only seeks injunctive relief against WSU and the individual defendants in their official capacity, and the full range of damages against the individual defendants in their individual capacity. Therefore, to the extent that there are any claims for non-injunctive damages against the state, either against WSU or the individual defendants in their official capacities, those claims should be dismissed.

## IV. FEDERAL CLAIMS

### A. Title VII Sexual Discrimination Claim

Plaintiff concedes that its Title VII claim does not survive this Summary Judgment Motion. Dkt. 38 at 23. Plaintiff's Title VII claims should be dismissed.

### B. Equal Protection Violation Pursuant to § 1983

#### 1. *McDonnell Douglas* Burden Shifting Analysis

The Ninth Circuit often applies the Title VII burden shifting scheme for claims under the Equal Protection clause of the U.S. Constitution. *Emeldi v. Univ. of Or.*, 673 F.3d 1218 (9th Cir. 2012) (noting Title VII framework useful in assessing claims of discrimination and retaliation outside the Title VII context, even where its application is not mandatory) (*citing Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir.2001) (applying the Title VII framework to an equal protection claim)).

Under the *McDonnell Douglas* burden shifting scheme, a plaintiff must first establish a prima facie case of discrimination consisting of the following elements: (1) plaintiff belongs to a protected class; (2) he or she was performing his job according to the employer's legitimate expectations; (3) he or she suffered an adverse employment action; and (4) other employees with qualifications similar to his or her own were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vasquez v. Cnty. of Los Angeles*, 307 F.3d 884, n. 5 (9th Cir. 2002). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment decisions. *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant satisfies this burden, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for a discriminatory motive. *Id.* at 804.

Here, it is undisputed that plaintiff is a member of a protected class as a homosexual and that she was terminated by denial of tenure. Defendant contests that she was qualified for tenure and that other similarly situated employees were treated more favorably. Plaintiff cites many awards and positive reviews to demonstrate her qualifications for tenure and she names four heterosexual individuals who were granted tenure, who she claims were similarly situated to her. Because very little evidence is required to establish a prima facie case, *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994), the plaintiff has met her prima facie burden in this case.

The burden then shifts to the defendants to give a nondiscriminatory reason for plaintiff's denial of tenure. Defendants have met their burden by citing several recommendations that expressed concern about plaintiff's qualification for tenure, specific to the area of her scholarship, in quantity and in journal prestige. Because scholarship is one of the three

emphasized areas in determining tenure under the Tenure and Promotion Handbook, defendants claim that a lack of scholarship was a sufficient reason for denial.

Plaintiff must then show that defendant's proffered reason for denial was pretext. Defendant does not explicitly address the quality of her own scholarship to show pretext, and rather argues that similarly situated heterosexual professors are granted tenure.

In an age discrimination case, a plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir.2003). *See McDonnell Douglas*, 411 U.S. at 804 (In a race discrimination case, "[e]specially relevant to [a showing of pretext] would be evidence that white employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained or rehired."); *see also Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001) (concluding that a showing that similarly situated employees were treated in a like manner to plaintiff "negat[ed] any showing of pretext").

Plaintiff claims that she was similarly situated to Professor Tamara Nelson and Professor Deanna Day, but she also mentions Aaron Oforlea and Pavithran Narayanan, and "[a]ll other candidates applying for tenure at the same time as [plaintiff]." Dkt. 38. Contrary to defendant's arguments, plaintiff has at least raised an issue of material fact as to whether these other individuals are heterosexual. However, individuals are only similarly situated when they have similar jobs and display similar conduct. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). The individuals plaintiff mentions are not sufficiently similarly situated to her based on the record submitted.

While both Dr. Day and Dr. Nelson received some negative comments about their scholarship, like plaintiff, their tenure was ultimately granted because, unlike plaintiff, (1) the candidate's area of research justified a less than average record of scholarship, (2) the candidate excelled in another aspect of research that supported any deficiencies in publications produced, and most importantly (3) Drs. Day and Nelson published in top tier, nationally recognized journals. Dkt. 41-23, Dkt. 41-24. In regards to Dr. Day, it appears that she actually produced a large amount of scholarship relative to plaintiff (26 articles vs. 7 articles); however, some of the negative feedback from faculty highlighted a lack of length and depth in Dr. Day's publications. Dkt. 41-24 at 53–87. However, as the Dean and the Vice-Chancellor pointed out, Dr. Day's research in the field of child literacy is misunderstood because the field is more practice-based than the typical theroretical framework. Id. at 45. Moreover, any lack of depth is obviated by her record as a "nationally recognized" scholar known for her research's "relevance and impact." *Id.* In regards to Dr. Nelson, her research was of a more comparable quantity to plaintiff's (both had seven articles), but Dr. Nelson's scholarship record was bolstered by a large amount of internal and external research funding (approximately $3.5 million, excluding a $2.7 million grant awarded while her tenure application was pending). Dkt. 41-23. In addition, one faculty member remarked that Dr. Nelson's area of science teacher education, rather than science education, was largely driven by long-term case studies which took longer to produce. Dkt. 41-23 at 32.

In regards to Dr. Oforlea and Dr. Narayanan, plaintiff provides no evidence regarding the substance or reviews of their tenure application. Specifically, there is no mention of the quality or quantity of their scholarship. Without this information, the court cannot evaluate whether those individuals were similarly situated to plaintiff. In regards to all other candidates applying

for tenure at the same time as plaintiff, plaintiff has provided no information regarding the scholarship or recommendations of those individuals. In addition, plaintiff's supporting materials show that in fact, at least one of the other candidates in her tenure class was a homosexual who was granted tenure: Dr. Kucer.

Plaintiff has not raised an issue of material fact as to whether the individuals she references are similarly situated in terms of scholarship. Therefore, plaintiff has not met her burden to show that defendant's non-discriminatory reason for denial was pretext. More importantly, it is not appropriate for the court to evaluate academic scholarship without the proper knowledge or specialization. Plaintiff asks the court to engage in the same evaluation of her scholarship that she claims the Provost Dr. Bayly is not equipped to do.

Plaintiff has failed to carry her burden and her claims under § 1983 for Equal Protection violations should be dismissed.

2. <u>Personal Participation by Defendants</u>

Even if plaintiff had met her burden showing WSU's reason for denying tenure as pretext, plaintiff has not alleged sufficient facts regarding the individual defendants' personal participation.

a. *Defendants Ernst-Slavit, Slavit, and Romanish*

Defendants Ernst-Slavit, Slavit, and Romanish were tenured faculty in the plaintiff's department who made recommendations to deny plaintiff's application for tenure. Although the Tenure and Promotion Handbook provided by both parties refers to faculty recommendations as "ballots," (see Dkt. 37-3 at 7; Dkt. 41-11 at 6) it is undisputed that such recommendations are not binding on any of the higher ranking recommenders, let alone on the Provost's final decision. Moreover, as defendants point out, defendants Ernst-Slavit, Slavit, and Romanish were the

minority voice among tenured faculty who supported granting plaintiff tenure by an overwhelming majority. Although defendants Ernst-Slavit, Slavit, and Romanish were aware of plaintiff's sexual orientation, their votes to deny her tenure do not rise to the level of personal participation resulting in constitutional harm. Any claim against defendants Ernst-Slavit, Slavit, and Romanish should be dismissed.

b. *Defendants Rud and Schmaling*

Similarly, defendants Rud and Schmaling were aware of plaintiff's sexual orientation, but their participation was not sufficient to amount to constitutional harm. Defendants Rud and Schmaling's recommendations to the Provost were also non-binding. More importantly, Rud and Schmaling both pointed to a lack of scholarship as their reason for denying tenure and plaintiff failed to raise a material issue of fact that their recommendation to deny her tenure was based on her sexual orientation. Plaintiff contends that Rud and Schmaling failed to remedy a known discriminatory environment, but even so there is no evidence that Rud and Schmaling knew of any discrimination towards plaintiff. Furthermore, even if Rud and Schmaling had failed to remedy a known discriminatory environment, such a showing does not satisfy the personal participation requirement of § 1983. Any claim against defendants Rud and Schmaling should be dismissed.

*c. Defendants Bayly and Floyd*

According to the depositions provided by plaintiff, defendant Floyd was not aware of plaintiff's sexual orientation at the times relevant to this suit. Dkt. 41-6. Defendants also contend that defendant Bayly was also unaware of plaintiff's sexual orientation when he made her tenure decision. Dkt. 35. Plaintiff does not refute these facts. *See* Dkt. 41-6. Plaintiff has not raised a material issue of fact as to Floyd and Bayly's knowledge of her sexual orientation.

Therefore, neither Floyd nor Bayly could have personally participated in discriminating against plaintiff based on her sexual orientation. Any claim against defendants Floyd and Bayly should be dismissed.

**V. STATE CLAIM FOR WLAD VIOLATION**

WLAD prohibits employers from discharging employees on the basis of their sexual orientation. RCW 49.60.030. When a plaintiff relies on direct evidence of discrimination to prove a WLAD claim, he or she need only prove that discriminatory animus was a substantial factor in the decision at issue, after which the burden of persuasion shifts to the employer, who must prove that it would have taken the same action regardless of discriminatory animus. *Griffith v. Schnitzer Steel Indus., Inc.,* 128 Wn. App. 438, 447 n. 4 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250–53 (1989) & *Mackay v. Acorn Custom Cabinetry, Inc.,* 127 Wn.2d 302, 309–10 (1995)). However, when a plaintiff attempts to prove a WLAD claim through the exclusive use of circumstantial evidence, the burden shifting analysis established in *McDonnell Douglas* is utilized. *Kastanis v. Educ. Employees Credit Union,* 122 Wn.2d 483, 490 (1993) (The Washington Supreme Court had previously "adopted the standard articulated by *McDonnell Douglas* in discrimination cases that arise out of [the WLAD]...."); *Grimwood v. Univ. of Puget Sound, Inc.,* 110 Wn.2d 355, 364 (1988) (adopting the *McDonnell Douglas* burden-shifting analysis as described in *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979)).

Because plaintiff only provides circumstantial evidence of her WLAD claim, the same *McDonnell Douglas* burden shifting analysis applied under the § 1983 claims applies here. Because plaintiff has not met her burden to show pretext, her claim under WLAD should also be dismissed.

**CONCLUSION**

With the dismissal of plaintiff's claims under Title VII, § 1983, and under WLAD, plaintiff has no remaining claims. Accordingly, this case should be dismissed.

**ORDER**

Therefore, it is hereby **ORDERED** that:

1. Plaintiff's Motion to Strike (Dkt. 38) is **DENIED**.
2. Defendants' Motion to Strike (Dkt. 43) is **DENIED**.
3. Defendants' Motion for Summary Judgment (Dkt. 32) is **GRANTED**. All of plaintiff's claims are **DISMISSED**, and this case is **DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 26th day of February, 2014.

ROBERT J. BRYAN
United States District Judge